Slip Op. 21-71

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD., | |
| Plaintiff, | |
| and | |
| SHANXI PIONEER HARDWARE INDUSTRIAL CO., LTD., | |
| Consolidated Plaintiff, | |
| and | |
| BUILDING MATERIAL DISTRIBUTORS, INC., | Before:  Leo M. Gordon, Judge |
| Consolidated Plaintiff, | |
| v. | Consol. Court No. 20-00103 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| MID CONTINENT STEEL & WIRE, INC., | |
| Defendant-Intervenor. | |

**OPINION**

[Commerce's <u>Final Results</u> sustained.]

Dated: June 9, 2021

    <u>Gregory S. Menegaz</u>, <u>J. Kevin Horgan</u>, and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC of Washington, DC for Plaintiff Xi'an Metals & Minerals Import & Export Co., Ltd.

Jeffrey S. Neeley and Stephen W. Brody, Husch Blackwell, LLP of Washington, DC for Consolidated Plaintiff Shanxi Pioneer Hardware Industrial Co., Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP of Washington, DC for Consolidated Plaintiff Building Material Distributors, Inc.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director.  Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Adam Gordon, Lauren Fraid, Jennifer Smith, and Ping Gong, The Bristol Group PLLC of Washington, DC for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

Gordon, Judge:   This action involves the U.S. Department of Commerce's ("Commerce") final results of the antidumping ("AD") administrative review issued as Certain Steel Nails from the People's Republic of China, 85 Fed. Reg. 22,399 (Dep't of Commerce Apr. 22, 2020) (final results of AD admin. review and final determ. of no shipments) ("Final Results"), and the accompanying Issues and Decision Memorandum (Dep't of Commerce Apr. 15, 2020), https://enforcement.trade.gov/frn/summary/prc/2020-08526-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are the motions for judgment on the agency record under USCIT Rule 56.2 filed by Plaintiff Xi'an Metals & Minerals Import & Export Co., Ltd. ("Xi'an Metals"), Consolidated Plaintiff Shanxi Pioneer Hardware Industrial Co., Ltd. ("Pioneer"), and Consolidated Plaintiff Building Material Distributors, Inc. ("BMD").  See Mem. in Supp.

of Xi'an Metals' Rule 56.2 Mot. for J. on the Agency R., ECF No. 31[1] ("Xi'an Metals Br.");

Mem. in Supp. of Pioneer's Rule 56.2 Mot. for J. on the Agency R., ECF No. 29 ("Pioneer

Br."); Mem. in Supp. of BMD's Rule 56.2 Mot. for J. on the Agency R., ECF No. 32

("BMD Br."); see also Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF

No. 33 ("Def.'s Resp."); Def.-Intervenor Mid-Continent Steel & Wire Inc.'s Resp. to

Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 36 ("Def.-Intervenor's Resp.");

Pl.'s Reply Br., ECF No. 41 ("Xi'an Metals Reply"); Reply Br. of Pioneer, ECF No. 39

("Pioneer Reply"); Reply Br. of BMD, ECF No. 42 ("BMD Reply").   The court has

jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,

19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[2] and 28 U.S.C. § 1581(c) (2018).  For the reasons

set forth below, the court sustains Commerce's Final Results.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains

Commerce's "determinations, findings, or conclusions" unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."

19U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations,

findings, or conclusions for substantial evidence, the court assesses whether the agency

action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States,

458 F.3d 1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB,

---

[1] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.
[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>DuPont Teijin Films USA v. United States</u>, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., <u>Administrative Law and Practice</u> § 9.24[1] (3d ed. 2021).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A <u>West's Fed. Forms</u>, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the Tariff Act.  <u>See</u> <u>United States v. Eurodif S.A.</u>, 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

In the underlying administrative review, Commerce selected three mandatory respondents for examination pursuant to the sampling methodology of 19 U.S.C. § 1677f-1(c)(2)(A) after finding conditions that raised enforcement concerns.  Decision Memorandum at 9–10; see generally Sample Methodology Notice, 78 Fed. Reg. 65,963, 65,964–65 ("[T]he Department will normally rely on sampling for respondent selection purposes in AD administrative reviews when the following conditions are met: (1) There is a request by an interested party for the use of sampling to select respondents; (2) the Department has the resources to examine individually at least three companies for the segment; (3) the largest three companies (or more if the Department intends to select more than three respondents) by import volume of the subject merchandise under review account for normally no more than 50 percent of total volume; and (4) information obtained by or provided to the Department provides a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from such information that would be associated with the remaining exporters."). Specifically, Commerce found that:

> in each of the nine prior administrative reviews under this order, Stanley has consistently been one of the largest exporters, and for this reason has been selected as a mandatory respondent in those prior reviews.  Stanley consistently has been a cooperative respondent, its average calculated weighted average dumping margin over the previous nine administrative reviews is 6.76 percent. In contrast, in each of the nine prior administrative reviews, the other mandatory respondents either obtained a much higher calculated margin, did not qualify for a separate rate, or were otherwise non-cooperative and received a margin

> based on total {AFA}.  We further note that, in the one new
> shipper review conducted under this order, the respondent
> received a calculated margin of 34.14 percent (significantly
> higher than Stanley's 15.43 percent margin for the partially
> overlapping period of review).  Thus, the average margin for
> respondents other than Stanley, including non-calculated
> margins, is 74.96 percent.  Even when we do not include
> those non-calculated margins, the average margin for
> respondents other than Stanley is 57.00 percent through the
> preliminary results of the 2016-2017 administrative review.
> Moreover, throughout the history of the proceeding, the
> China-wide rate, assigned to those respondents who have
> failed to demonstrate their independence from the China-wide
> entity, has consistently been 118.04 percent.

Decision Memorandum at 9–10.  The mandatory respondents selected for examination

were Stanley Works (Langfang) Fastening Systems Co., Ltd. and Stanley Black & Decker,

Inc. (collectively "Stanley"), Shanxi Pioneer Hardware Industrial Co., Ltd., and Tianjin

Universal Machinery Imp. & Exp. Corporation ("Tianjin Universal").  See id. at 10.

In the Final Results, Commerce calculated a 2.15% margin for Stanley, a 118.04%

margin for Pioneer, and a 118.04% margin for Tianjin Universal.  See Final Results,

85 Fed. Reg at 22,400.  Commerce determined that both Pioneer and Tianjin Universal

failed to cooperate in the subject administrative review to the best of their ability, and

accordingly, applied total adverse facts available ("total AFA").  See Decision

Memorandum at 4–5.  Commerce averaged the margins of the three mandatory

respondents, including the margins based on total AFA, weighted by the import share of

their strata, to derive a "sample" margin of 41.75%. See Calculation of the Sample Margin

for Respondents Not Selected for Individual Examination, PD[3] 264.  Commerce applied

this 41.75% rate to non-selected respondents who had established that they operated

free from Chinese Government control.

Pioneer challenges Commerce's decision to apply total AFA and assign a 118.04%

rate to Pioneer due to its failure to report its factors of production ("FOPs") on a CONNUM-

specific[4] basis as unlawful and unreasonable.  See generally Pioneer Br.  Xi'an Metals

and BMD are importers assigned the separate rate margin of 41.75% and challenge

Commerce's determination to include the total AFA rates of Pioneer and Tianjin Universal

in the calculation of the separate rate as unlawful and unreasonable.  See generally Xi'an

Metals Br. & BMD Br.

### A. Pioneer's Challenge to AFA

Commerce may rely on "facts otherwise available," if an interested party:

> withholds information that has been requested by
> [Commerce] … fails to provide such information by the
> deadlines for submission of the information or in the form and
> manner requested … significantly impedes a proceeding
> under this subtitle, or provides such information but the
> information cannot be verified[Commerce] shall … use facts

---

[3] "PD" refers to a document in the public administrative record, which is found in ECF No. 25-4, unless otherwise noted.  "CD" refers to a document in the confidential administrative record, which is found in ECF No. 25-5, unless otherwise noted.
[4] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding).  All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise under investigation.

> otherwise available in reaching the applicable determination under this title.

19 U.S.C. § 1677e(a)(2).   Additionally, Commerce may apply facts available with an adverse inference:

> [i]f [Commerce] … finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information …, [Commerce] … may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

19 U.S.C. § 1677e(b)(1).

In the preliminary results, Commerce calculated a margin for Pioneer based on the sales and FOP data submitted by Pioneer.  See Certain Steel Nails from the People's Republic of China, 84 Fed. Reg. 55,906, PD 241 (Dep't of Commerce Oct. 18, 2019) (prelim. results of AD admin. review and prelim. determ. of no shipments), and accompanying Preliminary Decision Memorandum, PD 224.  In the Final Results, Commerce determined that Pioneer failed to comply with requests for information and did not act to the best of its ability.  See Decision Memorandum at 32.  Consequently, Commerce applied total AFA to Pioneer and assigned it a rate of 118.04%.  See Final Results.

In the Final Results, Commerce determined that Pioneer had "repeatedly withheld requested information, significantly impeded the proceeding, failed to cooperate by not acting to the best of its ability" based on Pioneer's failure to comply with Commerce's instructions to report CONNUM-specific FOPs or "to maintain appropriate data such that it could properly report FOPs."  See Decision Memorandum at 32–33, 35 ("By not

reporting CONNUM-specific FOPs as requested, Pioneer has withheld information that has been requested of it, failed to provide data in the form and manner requested, and has significantly impeded this proceeding.  Therefore, the application of facts available is appropriate pursuant to section 776(a) of the Act.").  Commerce found that "Pioneer's refusal to make any attempt to develop more accurate and specific FOPs demonstrates a clear failure to report necessary information in the form and manner requested."  Id. at 33.  Commerce explained that it would apply an adverse inference in selecting facts available because of Pioneer's failure to develop an alternate reporting methodology "that would capture product-specific consumption," despite Commerce explicitly asking Pioneer to develop such a methodology in a supplemental questionnaire.  See id. at 34. Accordingly, Commerce determined:

> because Pioneer failed to cooperate by not maintaining adequate records and by not developing a methodology to report product-specific costs (information which is essential to the accurate calculation of Pioneer's dumping margin), Pioneer failed to act to the best of its ability to comply with a request for information.  Therefore, we use an inference adverse in selecting the facts otherwise available pursuant to section 776(b) of the Act.

Id.

At the conclusion of the third administrative review ("AR3"), Commerce advised respondents that the agency intended "to require … that respondents … report all FOPs data on a CONNUM-specific basis using all product characteristics in subsequent reviews."  Id. at 32 (internal quotation and citation omitted).  Here, Commerce noted that by the time of this review (the 10th AR) "documentation and data collection requirements should now be fully understood," and expected respondents to submit data on a

CONNUM-specific basis.  Id. (internal quotation and citation omitted).  Despite that expectation, Pioneer failed to explain why it was unable to provide the information in the form and manner requested by Commerce, nor did Pioneer suggest any alternative methods by which it could submit similar information, despite having been on notice of Commerce's reporting requirement since AR3.

Pioneer contends that Commerce's requirement that respondents report CONNUM-specific costs amounts to a "rule" that Commerce "promulgated … without proper notice and comment rule making."  See Pioneer Br. at 5–8 (citing Administrative Procedure Act ("APA")).  Pioneer also argues that "Commerce's rule regarding CONNUM-specific reporting for nails is arbitrary and capricious because Commerce never explains why its requirements are necessary in this case but not for other products."  Id. at 8–15. Pioneer further maintains that Commerce provided insufficient notice as to its CONNUM-specific reporting requirement; that this reporting requirement violated the agency's own regulations; that Commerce did not explain why total adverse facts available was necessary or warranted when Pioneer cooperated by supplying the requested information in its normal books and records; and that Commerce's application of AFA to Pioneer is unreasonable.  See id. at 15–30.

The court now turns to Pioneer's argument that the CONNUM-specific reporting requirement is tantamount to a "rule" promulgated without the requisite notice-and-comment rulemaking required under the APA.  Defendant disagrees, contending that the APA's notice and comment requirement "applies to legislative rules and does not apply to 'interpretive rules, general statements of policy, or rules of agency organization,

procedure, or practice.'" Def.'s Resp. at 12–13 (quoting <u>Apex Frozen Foods Private Ltd.</u> <u>v. United States</u>, 40 CIT ___, ___, 144 F. Supp. 3d 1308, 1319–20 (2016), <u>aff'd</u>, 862 F.3d 1337 (Fed. Cir. 2017)).   In <u>Apex Frozen Foods</u>, the court adopted the U.S. Court of Appeals for the District of Columbia Circuit's framework for determining whether an agency rule is a legislative rule that must undergo notice-and-comment rulemaking:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

See <u>Apex Frozen Foods</u>, 40 CIT at ___, 144 F. Supp. 3d at 1320 (citing <u>Am. Mining Cong.</u> <u>v. Mine Safety Admin.</u>, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).   The facts of this case only implicate the third factor as to whether the CONNUM-specific reporting requirement constitutes a legislative rule.   The short answer is "no."

Despite Pioneer's contention to the contrary, Commerce's adoption of a CONNUM-specific reporting requirement does not amount to the implementation of a legislative rule that would require notice-and-comment rulemaking.   While arguing that 19 U.S.C. § 1677b "expresses a preference for Commerce to rely on the company's normal books and records if kept in accordance with generally accepted accounting principles," <u>see</u> Pioneer Br. at 13, Pioneer ignores the further requirement of the statute that such records must also "reasonably reflect the costs associated with the production and sale of the merchandise."   19 U.S.C. § 1677b(f)(1)(A).   Here, Commerce found that Pioneer's failure to submit its cost information on a CONNUM-specific basis meant that

Pioneer's cost information did not reasonably reflect the costs of production of the merchandise.     See   Decision   Memorandum   at   32–35   (emphasizing   that CONNUM-specific cost information Commerce requested was "information which is essential to the accurate calculation of Pioneer's dumping margin").   As Commerce explained:

> [a]fter initially not requiring product-specific reporting in early
> segments of this proceeding, in the third administrative
> review, in 2013, we stated that Commerce 'intends to require
> … [that] respondents for this case report all FOPs data on a
> CONNUM-specific basis using all product characteristics in
> subsequent reviews, as documentation and data collection
> requirements should now be fully understood.'  Pioneer, by its
> own account, did not heed our instructions to maintain
> appropriate data such that it could properly report FOPs.

Id. at 32 (quoting Certain Steel Nails from the People's Republic of China, 78 Fed. Reg. 16,651 (Dep't of Commerce Mar. 18, 2013) (Final Results of AR3), and accompanying Issues and Decision Memorandum at cmt. 5).

        In announcing in AR3 that it would require respondents to report CONNUM-specific data, Commerce determined that it needed data that more accurately reflected the costs associated with the production and sale of the subject merchandise.  See id. Commerce's pronouncement reflects a statement of policy rather than the agency's explicit invocation of general legislative authority, which triggers the notice and comment requirement of the APA.  See Apex Frozen Foods, 40 CIT at ___, 144 F. Supp. 3d at 1320 n. 12 (citing Attorney General's Manual on the Administrative Procedure Act (1947)). Pioneer fails to point to anything in the record that reflects the explicit invocation of Commerce's general legislative authority.   It is not sufficient for a plaintiff, such as

Pioneer, to make a general allegation; it must do something more to demonstrate a violation of the notice and comment provision.  Accordingly, the court is not persuaded by Pioneer's argument that Commerce's reporting requirements violated the APA.

Pioneer argues that Commerce's CONNUM-specific reporting requirements are more rigorous for nails as compared to other products, and therefore Commerce's requirements are arbitrary and capricious.  See Pioneer Br. at 8–12.  In response, Defendant maintains that "Pioneer … mischaracterizes Commerce's alleged lack of explanation as to why CONNUM-specific factors of production reporting is necessary for reviews involving nails from China, but not most other products."  Def.'s Resp. at 11. Defendant emphasizes that CONNUM-specific reporting is not unique to nails, noting that "the default non-market economy questionnaire, which was issued to Pioneer in the underlying proceeding, is issued in all other antidumping administrative reviews involving non-market economy countries."  Id. (internal citations omitted).  Pioneer's argument is misplaced, as the default questionnaire for non-market economy AD administrative reviews makes clear.  In particular, the default questionnaire states:

> If you are not reporting factors of production using actual quantities consumed to produce the merchandise under review on a CONNUM-specific basis, please provide a detailed explanation of all efforts undertaken to report the actual quantity of each {factor of production} consumed to produce the merchandise under review on a CONNUM-specific basis.

See id. (quoting the AD Questionnaire at D-2, PD 98).

In this review, Commerce determined that CONNUM-specific FOP data was essential in order to calculate costs in an accurate manner, and that Pioneer's failure to

Case 1:20-cv-00103-LMG   Document 45   Filed 06/09/21   Page 14 of 28

Consol. Court No. 20-00103                                              Page 14

report such data prevented Commerce from accurately calculating Pioneer's costs.  <u>See</u>
<u>Decision Memorandum</u> at 34.  The court sees no merit in Pioneer's argument that
Commerce acted arbitrarily and capriciously.  Pioneer is unable to show how Commerce's
CONNUM-specific reporting requirements in this review exceed the reporting
expectations that Commerce maintains in other AD administrative reviews involving non-
market economy countries, nor has Pioneer demonstrated that this CONNUM-specific
reporting requirement is unreasonable.

Relatedly, Pioneer also challenges Commerce's refusal to accept their normal
books and records despite the fact that those records did not comply with Commerce's
CONNUM-specific reporting requirement.  Specifically, Pioneer argues that "Commerce
never provided any analysis of why CONNUM-specific reporting and recordkeeping was
needed with respect to the nails industry."  <u>See</u> Pioneer Br. at 22–25.  Pioneer relies on
the decision by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") in
<u>Hynix Semiconductor, Inc. v. United States</u>, 424 F.3d 1363 (Fed. Cir. 2005), contending
that the Federal Circuit held that Commerce must explain why a respondent's records
that were kept according to generally accepted accounting practices ("GAAP") are not
reasonably reflective of its costs before finding that those records are unsuitable for FOP
calculations. <u>Id.</u> at 23.

In <u>Hynix</u>, over the course of the proceeding the respondent switched from
expensing its research and development ("R&D") costs to amortizing them, and it was
uncontested that both accounting methodologies were in accordance with the
respondent's home nation GAAP.  424 F.3d at 1369–70.  Commerce refused to accept

the respondent's amortized R&D expenses, and instead calculated respondent's costs by expensing respondent's R&D costs. Id. Commerce explained that it did not need to accept respondent's amortized R&D expenses, noting that although the amortized R&D expenses were in accordance with GAAP, the respondent's amortized expense calculations would result in underreporting of the respondent's expenses in the current year. Id. at 1370. The Federal Circuit reversed the trial court's decision to require Commerce to accept respondent's amortized expenses, and instead remanded the matter to allow Commerce to expense the respondent's R&D costs and reject respondent's GAAP-compliant records of amortized R&D expenses. Id. The appellate court emphasized that 19 U.S.C. § 1677b(f)(1)(A) permits Commerce to disregard a respondent's GAAP-compliant records upon finding "that the costs do not reasonably reflect the costs of production and should not, therefore, be used." See id.

Here, Commerce explained that CONNUM-specific reporting yields data more specific to the costs of the subject merchandise than standard GAAP records. See Decision Memorandum at 32–33. Pioneer acknowledges that using GAAP reporting may not reflect the actual cost of the subject merchandise. See Pioneer Br. at 23–24 ("Products in all cases investigated by Commerce have variations in the physical characteristics of different models. If there is a difference in physical characteristics or yield loss, how great are those differences such that only CONNUM-specific reporting will prevent any distortions? Are these concerns even applicable to the nails produced and sold by Pioneer?"). Critically though, Commerce accepts GAAP records only if they "reasonably reflect the costs associated with the production and sale of the merchandise,"

and the possibility of distortion can preclude Commerce from accepting such records. <u>See</u> 19 U.S.C. § 1677b(f)(1)(A).  In this review, Commerce considered CONNUM-specific data to be essential for the accurate calculation of costs.  <u>See</u> <u>Decision Memorandum</u> at  34.  Pioneer contends that "[t]o suggest that failure to report FOPs on a size and weight specific basis significantly distorts the margin defies common sense given the minor physical variations of this product."  <u>See</u> Pioneer Br. at 23–25.  However, Pioneer does not explain how the data it cited precluded the possibility of the margin being significantly distorted.  Similarly, although Pioneer argues that whatever distortion may have resulted from Pioneer's GAAP reporting would not have been "even remotely close to [the] 118.04 percent" rate, <u>see</u> <u>id.</u>, Pioneer fails to demonstrate that the AFA rate applied to it was unreasonable.  Given the record, the court cannot agree that Commerce unreasonably determined that Pioneer's reported FOP data may not reflect the costs associated with the production of subject merchandise.

Pioneer next contends that it lacked sufficient notice of Commerce's CONNUM-specific reporting requirement that the agency expressly adopted in AR3.  <u>See</u> Pioneer Br. at 17–19.  However, Pioneer acknowledges that the court has, in prior decisions, upheld Commerce's announcement of its intent to require CONNUM-specific reporting as providing sufficient notice for respondents to reasonably be aware of and comply with the change in subsequent reviews.  <u>See</u> Pioneer Br. at 5 (citing <u>An Giang Fisheries v. United States</u>, 42 CIT ___, 287 F. Supp. 3d 1361 (2018) and <u>Thuan An Prod. Trading & Serv. Co. v. United States</u>, 42 CIT ___, 348 F. Supp. 3d 1340 (2018)); <u>see also</u> <u>Decision Memorandum</u> at 35 (relying on <u>An Giang</u> and <u>Thuan An</u> as support for

concluding respondents were on notice of CONNUM-specific reporting requirement in underlying review).  Given that Commerce expressly announced its CONNUM-specific reporting requirement in AR3, and maintains CONNUM-specific reporting requirements as part of its general AD questionnaire, the court does not agree that Commerce failed to provide reasonable notice of its reporting requirements in this review.

Pioneer also argues that Commerce's insistence that Pioneer report FOP information on a CONNUM-specific basis violates the agency's own regulations; however, Pioneer only cites generally to provisions in 19 C.F.R. § 351.401(g), none of which prohibit Commerce's CONNUM-specific FOP reporting requirement.  See Pioneer Br. at 15–19. Rather, those regulatory provisions provide that the agency "may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided … that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1); see also 19 C.F.R. § 351.401(g)(2) & (g)(3).

Here, Commerce provided Pioneer with multiple opportunities to report its factors of production on a CONNUM-specific basis, and noted that even if Pioneer's normal books and records did not reflect this information, Pioneer could have provided an alternative methodology to "reasonably capture product-specific consumption." See Decision Memorandum at 32–34.  Commerce's refusal to accept Pioneer's normal books and records as sufficient, and to excuse Pioneer's failure "to make any attempt to develop more accurate and specific FOPs," did not violate 19 C.F.R. § 351.401(g). Pioneer's contention that Commerce "has denied respondent the opportunity to use another allocation methodology by requiring a more specific method of reporting and

recordkeeping," see Pioneer Br. at 16, is not supported by the record.  Indeed, as the record demonstrates, Pioneer failed to even provide more than short, conclusory statements as to why it could not comply with Commerce's requests, much less actually attempt to develop a methodology.  See Decision Memorandum at 32 ("Pioneer simply responded that it could not provide FOPs on such a basis, because it does not record CONNUM/product-specific FOP consumption in its accounting system.  In [response to] a supplemental questionnaire, … Pioneer again summarily responded that it had 'no cost records that would support any other allocation methodology.'").  Accordingly, the court is not persuaded by Pioneer's argument that Commerce violated its own regulations in applying AFA to Pioneer.

Given Commerce's longstanding reporting requirements, of which Pioneer was or should have been aware, as well as Commerce's multiple requests for CONNUM-specific FOP information and Pioneer's refusal to develop an alternative reporting methodology, the court sustains Commerce's finding that Pioneer failed to cooperate and to act to the best of its ability, thereby justifying the use of AFA.

### B. Calculation of the "Sample" Rate

Xi'an Metals and BMD ("Separate Rate Plaintiffs") challenge as unlawful Commerce's inclusion of the AFA rates assigned to two of the three mandatory respondents in the agency's calculation of the "sample rate" assigned to respondents who were not individually reviewed.  Separate Rate Plaintiffs' legal arguments parallel those raised in challenges to the previous administrative review and addressed in Shanxi Hairui

Trade Co. v. United States, 45 CIT ___, 2021 WL 1291671 (Apr. 7, 2021), appeal filed, (Fed. Cir. Jun. 4, 2021).  See Xi'an Metals Br. at 5–12; BMD Br. at 4–7.

The Separate Rate Plaintiffs argue that although 19 U.S.C. § 1673d was "written to address investigations, [Commerce], as upheld by this Court, has consistently relied upon this section of the statute when determining separate rates in reviews."  Xi'an Metals Br. at 5.  Separate Rate Plaintiffs contend that, "following the plain and unambiguous meaning" of § 1673d(c)(5)(A) and the attendant legislative history indicating the prohibition on the inclusion of AFA rates, Commerce's inclusion of AFA rates in the sample rate calculation was unlawful.[5]  Id. at 5 & 9; BMD Br. at 4–6.  Xi'an Metals specifically argues that Commerce's decision to rely on § 1673d in the context of administrative reviews conducted pursuant to § 1677f-1(c)(2)(B) but not administrative reviews conducted pursuant to § 1677f-1(c)(2)(A) interprets § 1673d "to apply to one situation and not another, when the statute itself makes no distinction."  Xi'an Metals Br. at 5–6; Xi'an Metals Reply at 2–4.  The Separate Rate Plaintiffs cite various decisions by this Court and the Federal Circuit in support of their position.  See Xi'an Metals Br. at 9–11; BMD Br. at 8–10 (citing, e.g., Albemarle Corp. v. United States, 821 F.3d 1345 (Fed. Cir. 2016); Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006 (Fed. Cir. 2017); Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir.

---

[5] While the Separate Rate Plaintiffs' arguments reference the "plain meaning" of the relevant statutory provisions, they acknowledge that the statute is silent as to the precise question at issue.  See BMD Reply at 2 ("It is undisputed that the sampling statute (19 U.S.C. § 1677f-1(c)(2)(A)) is silent with regard to how Commerce is to calculate the rate for non-selected companies where sampling under Subparagraph A is the method of respondent selection.").

2013); Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367 (Fed. Cir. 2012); Bosun Tools Co. v. United States, 44 CIT ___,  463 F. Supp. 3d 1309 (2020)). The problem for Separate Rate Plaintiffs, however, is that none of the cited cases address Commerce's calculation of a sample rate under § 1677f-1(c)(2)(A).

As the court explained in Shanxi Hairui, Separate Rate Plaintiffs' arguments about Commerce's reliance on § 1673d in prior administrative reviews ignores the fact that under step two of Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), an agency is free to change its mind and adopt another interpretation of a silence in the statutory regime.   Although Separate Rate Plaintiffs have demonstrated that Commerce has previously relied upon § 1673 in calculating the separate rate in some administrative reviews, it is undisputed that Commerce formally adopted a new policy in 2013, namely, the agency will not rely on § 1673 in administrative reviews under certain circumstances.  See Sample Methodology Notice, 78 Fed. Reg. at 65,964–65 & 65,968–69 (explaining that Commerce would use sampling methodology under 19 U.S.C. § 1677f-1(c)(2)(A) for AD administrative reviews when certain conditions were met, and Commerce would include "all rates in the sample," including AFA rates).   While Commerce's prior interpretations are relevant (including its acknowledgment that it has routinely relied upon § 1673 in administrative reviews conducted under § 1677f-1(c)(2)(B)), and do curb its discretion by requiring a reasonable explanation that accounts for its prior approach, Commerce has provided that reasonable explanation for its decision to not rely on § 1673 in its rate calculation for the underlying review. See Decision Memorandum at 8–14.   Accordingly, the Separate Rate Plaintiffs'

arguments contesting the legality of Commerce's inclusion of AFA rates in the calculation of the sample rate fail for the same reasons set forth in <u>Shanxi Hairui</u>.

While the analysis set forth in <u>Shanxi Hairui</u> explains why Commerce's sample rate calculation methodology is permissible, it does not completely resolve the Separate Rate Plaintiffs' challenge to the sample rate calculated in this action.  In addition to challenging the legality of Commerce's rate calculation methodology, the Separate Rate Plaintiffs here contend that Commerce acted unreasonably in <u>applying</u> its sampling methodology (including the sample rate calculation) in the underlying review.  <u>See</u> Xi'an Metals Br. at 7; BMD Br. at 7–11 ("Even If Permitted By Statute, Commerce's Approach Is Not Reasonable and Thus Should be Reversed Under General Principles of Fairness in the Administration of the Antidumping Law").

Xi'an Metals highlights that in the subject review Commerce "sampled only three respondents, two of whom received a total AFA margin."  <u>See</u> Xi'an Metals Br. at 7 (distinguishing court's deference to Commerce's sampling methodology in <u>Asociacion Colombiana de Exportadores de Flores v. United States</u>, 13 CIT 13, 704 F. Supp. 1114 (1989), where Commerce selected 28 sample respondents).  Beyond this lone critique of Commerce's selected sample size, however, Separate Rate Plaintiffs fail to develop any argument challenging the reasonableness of Commerce's selected sample size. Commerce explained that the sample here was selected by "a stratified random PPS [probability proportion to size] sampling procedure."  <u>Decision Memorandum</u> at 10. Commerce found that while this review covers 212 individually-named companies, it would not be feasible to individually examine all known producers/exporters and instead

would conduct a review of a statistically valid sample of respondents.  See Respondent

Selection Sampling Memo at 3–4, PD 84.

Commerce determined that it had the resources to individually examine three

respondents, from a pool of approximately 20 companies that qualified for separate rate

status.  Id. at 6, 14.  Commerce explained that its selection of respondents by sampling

was in accord with the factors set forth in its Sampling Methodology Notice.  Id. at 8.

Commerce highlighted its enforcement concern that "as exporters accounting for smaller

volumes of subject merchandise become aware that they are effectively excluded from

individual examination by Commerce's respondent selection methodology, they may

decide to lower their prices as they recognize that their pricing behavior will not affect the

AD rates assigned to them."  Decision Memorandum at 9 (citing the Sampling

Methodology Notice).  Commerce also noted that its decision to use sampling was

bolstered by the ninth administrative review, where "the pattern of non-participation

continued with one respondent failing to participate after being selected using the

sampling method."  Id. at 10.  While the Separate Rate Plaintiffs may decry the number

of companies that Commerce determined to individually examine, they failed to

demonstrate that Commerce's decision to select only three individual respondents was

unreasonable.

In fact, Commerce's decision to use sampling was prompted by Defendant-

Intervenor Mid Continent Steel & Wire, Inc.'s ("Mid Continent") request, as Mid Continent

detailed "the history of separate rate companies' exploitation of Commerce's reliance

upon 19 U.S.C. § 1677f-1(c)(2)(B) by requesting their own reviews and obtaining separate

rate status with the goal of free-riding on the historically low margin associated with the largest exporter reviewed (Stanley) and with no real intention of being examined, and when they are selected for individual examination, they refuse to participate, initially participate but cease participating at a point when it is simply too late for Commerce to select a replacement respondent, or, if they complete the review, are found not to be eligible for a separate rate, or receive a very high calculated margin or AFA margin)." Def.-Intervenor's Resp. at 16 (citing Mid Continent's Request for Sampling at 6–18, PD 58).   Defendant-Intervenor further notes that "this pattern of non-participation continued even in the administrative review on appeal.  When Universal was selected as one of the mandatory respondents, despite submitting a separate rate certification (just as Xi'an and the separate rate respondents from whom BMD imported subject nails did), and 'cooperating' as far as submitting materials to establish their separate rate status (as Xi'an and BMD claimed in their opening briefs), it failed to respond to the antidumping questionnaire issued by Commerce and was assigned an AFA rate."  Def.-Intervenor's Resp. at 17 (citing Decision Memorandum at 13).  Given the record and Commerce's reasonable explanation for its sampling methodology applied in this review, the court cannot conclude that Commerce acted unreasonably in deciding to sample only three companies as the basis for calculating the sample rate.

    In the context of their overall challenge, the Separate Rate Plaintiffs portray themselves as "cooperative."   See, e.g., Xi'an Metals Br. at 7–8; BMD Br. at 10–11. Commerce, however, expressed concerns regarding potential rate manipulation by "cooperative" separate rate respondents that have no intention of complying if selected

for individual investigation, and thus determined that inclusion of AFA rates in the sample rate calculation was appropriate.  Notably, the court previously sustained Commerce's inclusion of individually calculated AFA rates in the sample rate, concluding that Commerce's reliance on a random sampling methodology eliminates the threat of improper application of AFA to "cooperative" respondents.  See <u>Laizhou Auto Brake Equip. Co. v. United States</u>, 32 CIT 711, 724 (2008) ("It is important to note that Commerce is not cherry picking here, nor is there anything arbitrary about the way it is constructing this sample ….This Court therefore need not address Plaintiffs' contention that Commerce's approach 'punishes fully cooperative parties by assigning them a rate unfairly inflated by the non-cooperation of [another] party,' as this is more a moral argument than a legal one.").  As Commerce explained here, "[b]ecause Commerce is constructing a sample that is intended to be representative of the population as a whole, it has included all the observations in the sample rate, including the AFA rates.  Disregarding these actual observations would be contrary to the very principle of random sampling and would invalidate the sample since the sample is supposed to be indicative of the population as a whole."  <u>Decision Memorandum</u> at 13.  While the Separate Rate Plaintiffs seek to discredit the rationale in <u>Laizhou</u> as effectively overruled by subsequent precedent, the court is not persuaded.  Separate Rate Plaintiffs' reliance on those cases is misplaced, as they arose outside of the sampling context.

The Separate Rate Plaintiffs also argue that the sample rate assigned by Commerce is not reasonably reflective of respondents' potential dumping margins.  See BMD Br. at 7–10; Xi'an Metals Br. at 12–15.  In their view, although the inclusion of AFA

rates may be necessary to preserve the validity of the sample, Commerce's rate calculation must still be supported by substantial evidence confirming that the resultant sample rate is reflective of the economic reality.  See Albemarle, 821 F.3d at 1354 (citing Bestpak for the proposition that "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters"); Bestpak, 716 F.3d at 1379–80 ("rate determinations for nonmandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins"); Bosun Tools, 44 CIT at ___, 463 F. Supp. 3d at 1318 ("It does not stand to reason that the statutory directive not to consider 'commercial reality' in the AFA context obviated the fairness and accuracy concerns identified by Bestpak when applying a separate statutory provision to cooperative respondents.").  Specifically, Xi'an Metals argues that "[i]n sum, a margin used to deter non-cooperating mandatory respondents that is demonstratively higher than the history of dumping in the Order generally, is not reasonably reflective of the dumping margin of cooperating separate rate companies."  Xi'an Metals Reply at 9.  Xi'an Metals further notes that as it previously fully cooperated with Commerce's individual investigation during the fifth administrative review, Commerce's application of AFA in this administrative review is particularly unrepresentative.  See Xi'an Metals Br. at 13–14.

Unfortunately, Separate Rate Plaintiffs have not identified anything in the record showing that the sample rate calculated using Stanley's calculated margin and Universal's and Pioneer's AFA rates is not accurate or does not bear a reasonable relationship to their actual dumping margins.  Instead, Separate Rate Plaintiffs rely primarily on the precedent previously addressed and distinguished in this opinion.

See supra at 19–20 (distinguishing cases listed in BMD Br. at 7–10 & Xi'an Metals Br. at 12–14).

Here, BMD argues that "Commerce's application of an all others rate based on total AFA is especially unreasonable given that the only calculated rate (for Stanley) in this review is an extremely low 2.11%" compared to the all-others rate assigned to non-investigated respondents of 41.75%.  See BMD Br. at 10–11.  Separate Rate Plaintiffs note that although Commerce justifies "the high all others rate in this review by claiming that the average calculated rates for companies other than Stanley over the course of the last nine reviews is 57%," the only respondent "that has fully cooperated in all segments of these past nine reviews and its rate has decreased over time" from 11.95% in the sixth review to 2.11% in the tenth review.  Xi'an Metals Br. at 14; BMD Br. at 11.

Separate Rate Plaintiffs' arguments that their rates should be similar to that of Stanley ignore Commerce's findings in the previous administrative reviews that the separate rate respondents' dumping behavior was different than that of Stanley.  In fact, Commerce's finding in this review that separate rate respondents engaged in distinctly different dumping than Stanley was a key basis for Commerce's decision to select respondents by sampling in the first place.  See Respondent Selection Sampling Memo at 2 ("Given the large disparity between Stanley's calculated margins and the margins assigned to the other respondents in the past nine administrative reviews, we find that [there is a reasonable basis to believe or suspect that the average export prices and/or dumping margins for Stanley differ from such information that would be associated with the remaining exporters.]").  Accordingly, the court is not persuaded by Separate Rate

Plaintiffs that Commerce acted unreasonably in calculating a sample rate that exceeded the individual rate assigned to Stanley.

Separate Rate Plaintiffs' reliance on <u>Bosun Tools</u> is misplaced for the same reason.  <u>See</u> BMD Br. at 9.  In <u>Bosun Tools</u>, the court held that Commerce's separate rate calculation under the "expected method" of § 1673d(c)(5)(B) was unreasonable because Commerce failed "to address evidence which detracts from its determination." 44 CIT at ___, 463 F. Supp. 3d at 1318.  Specifically, the court observed that the separate rate respondents in that matter had "put forth evidence that the expected method would result in an unreasonable rate."  <u>Id.</u> (citing Separate Rate Plaintiffs' brief explaining that "'there is a history of low calculated dumping margins,' including margins assigned to Bosun following individual examination").  Here, however, Separate Rate Plaintiffs have not demonstrated that Commerce failed to consider anything that challenges the reasonableness of the 41.75% sample rate.  In response to Commerce's finding that the sample rate calculated was reasonable as the "average calculated rates for companies' other than Stanley over the course of the last nine reviews is 57%," Separate Rate Plaintiffs continue to focus on Stanley's low rate, which declined over the course of prior administrative reviews, and insist that Stanley's rate and cooperation should detract from the reasonableness of a high sample rate calculation.  <u>See</u> Xi'an Metals Br. at 14 (citing <u>Decision Memorandum</u> at 10); BMD Br. at 11.  Again, Separate Rate Plaintiffs ignore Commerce's findings here that the separate rate respondents' dumping behavior was different than that of Stanley.  For the reasons provided, Separate Rate Plaintiffs have

not persuaded the court that Commerce's sample rate calculation was unreasonably high and not reflective of separate rate respondents' dumping margins.

### III. Conclusion

For the foregoing reasons, the court sustains the <u>Final Results</u>.  Judgment will be entered accordingly.

/s/ Leo M. Gordon
_____
Judge Leo M. Gordon

Dated: June 9, 2021
     New York, New York